**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

ANTHONY MARVIN BOYD,                                    Civ. No. 08-785 (MJD/FLN)

      Plaintiff,

v.                                    **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____

      Defendant has denied Plaintiff Anthony Boyd's applications for disability insurance

benefits (DIB) and supplemental security income (SSI) under the Social Security Act, 42 U.S.C.

§§ 416, 423.  Plaintiff filed a complaint seeking review of the denial of benefits on March 19,

2008.  The action is now before the Court on cross-motions for summary judgment.  Plaintiff is

represented by Fay E. Fishman, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant

United States Attorney.  This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§

205(g) and 405(g), and it is properly before the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c), and Local Rule 72.1.  For the reasons stated below it is recommended that

Plaintiff's motion for summary judgment be denied  [Docket No. 17]; and Defendant's motion

for summary judgment be granted [Docket No. 22].

**I.     PLAINTIFF'S BACKGROUND**

      Plaintiff Anthony Boyd was forty-six-years-old on the date of the ALJ's decision.  (Tr.

52.)  He has a ninth grade education.  (Tr. 8-9.)  He has past relevant work in building

1

maintenance, carpentry, and as a janitor.  (Tr. 202.)  Plaintiff was fired from his job on October

13, 2005, and alleges disability from neck and back pain beginning on that date.  (Tr.161, 156-

76.)

## II.    PROCEDURAL BACKGROUND

### A.    <u>Administrative Process</u>

Plaintiff filed applications for disability on March 31, 2006.  (Tr. 133-42.)  The

applications were denied initially and upon reconsideration.  (Tr. 65-69, 71-76.)  Plaintiff

requested a hearing before an Administrative Law Judge.  A hearing was held before

Administrative Law Judge Roger W. Thomas on November 5, 2007.  (Tr. 2-33.)  On December

11, 2007, the ALJ issued an unfavorable decision.  (Tr. 42-53.)  The Social Security

Administration Appeals Council denied a request for further review.  (Tr. 38-41.)  The denial of

review made the ALJ's findings the final decision of the defendant.  42 U.S.C. § 405(g);

<u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992).  Plaintiff seeks review of the denial of

benefits pursuant to 42 U.S.C. §§ 205(g) and 405(g).

### B.    <u>Medical Records</u>

Plaintiff saw Dr. Fred Lewis for low back pain on June 10, 2005.  (Tr. 268.)  On

examination, Plaintiff had moderate tenderness in the lumbosacral region.  (<u>Id.</u>)  Dr. Lewis

prescribed Tramadol.  (<u>Id.</u>)  The next month, Plaintiff complained of neck pain and back pain

preventing him from lifting anything heavy at work.  (Tr. 267.)  Dr. Lewis noted Plaintiff to have

a herniated lumbar disc and degenerative cervical disc with spinal stenosis.[1]  (<u>Id.</u>)  On

---

[1]     Stenosis is the stricture of any canal or orifice.  STEDMAN'S MEDICAL
DICTIONARY  1695 (27th ed. 2000) ("STEDMAN'S").

examination, Plaintiff was tender in the cervical and lumbar spine.  (Id.)  Dr. Lewis prescribed

Celebrex and Ultracet for pain, and recommended a permanent fifteen-pound lifting restriction.

(Id.)

In September 2005, Plaintiff complained of continued severe neck and back pain.  (Tr.

264.)  He requested work restrictions from Dr. Lewis.  (Id.)  On examination, Plaintiff had mild

cervical and lumbar tenderness.  (Id.)  His cervical and lumbar range of motions were good, with

no spasms present.  (Id.)  Dr. Lewis wrote work restrictions for no lifting more than ten pounds,

no lifting above the head, and no bending.  (Id.)  The next month, Plaintiff reported feeling better

but still having some pain.  (Tr. 263.)  Dr. Lewis continued treatment with Tramadol.  (Id.)

Plaintiff lost his job in October 2005.  (Tr. 161.)

Plaintiff went to an emergency room on February 13, 2006.  (Tr. 204-05.)  The

emergency room note states, "[r]einjured his back on the job last Weds.  Has a sharp pain that

starts in his low back and shoots down his left leg."[2]  (Tr. 205.)  Plaintiff went to the emergency

room again on February 27, and reported back pain increasing over the last five days.  (Tr. 203.)

On examination, Plaintiff exhibited tenderness in the neck to the left lateral trapezius, and diffuse

tenderness in the lumbar regions.  (Tr. 204.)  Examination was otherwise normal.  (Id.)  Plaintiff

was treated with Indocin, capcecin cream, and Naprosyn.  (Tr. 204.)

On April 4, 2006, Dr. Lewis completed a Minnesota Department of Employment and

Economic Development Medical Statement form on Plaintiff's behalf.  (Tr. 211.)  He indicated it

was his opinion that Plaintiff was permanently, totally unable to perform any type of work.  (Id.)

---

[2]    This Court can find no other evidence in the record that Plaintiff was working in
February 2006 or any time after his alleged disability onset date of October 13,
2005.

3

Dr. Lewis noted that he was treating Plaintiff for herniated lumbar discs, degenerative disc disease, and spinal stenosis.  (Id.)  Approximately one week later, Dr. Lewis treated Plaintiff for low back pain.  (Tr. 259.)  There was no swelling or tenderness on examination.  (Id.)  Dr. Lewis prescribed Robaxin and Naprosyn.  (Id.)

On May 31, 2006, Dr. Mark Thomas, an orthopedic surgeon, opined that Plaintiff had reached maximum medical improvement on April 27, 2006.  (Tr. 280.)  Dr. Thomas examined Plaintiff for the sole purpose of an independent medical evaluation, and reviewed the pertinent medical records.  (Tr. 281.)  Plaintiff reported that his symptoms began when he was working with dumpsters at work.  (Id.)  The pain began in his neck and left arm, with numbness in the thumb and index finger.  (Id.)  He improved after several injections, but after working with dumpsters again, he woke up the next day and could not straighten up.  (Id.)

Dr. Thomas reviewed Plaintiff's medical records going back to a CT scan of Plaintiff's cervical spine in April 2003.  (Tr. 283.)  The scan was done in response to Plaintiff's complaints of left shoulder and hand numbness and pain.  (Id.)  The scan showed mild to moderate spondylosis[3] at multiple levels.  (Id.)

The medical records reviewed by Dr. Thomas indicated that in July 2004, Plaintiff was examined by Dr. Vanda Niemi at Noran Neurological Clinic for evaluation of neck, back, and right knee pain.  (Id.)  Plaintiff reported injuring his low back when he was in his early twenties, with flare-ups about every two years since then.  (Id.)  His neck pain was of a gradual onset and became particularly prominent in the last year.  (Id.)  An MRI of Plaintiff's cervical spine on

---

[3]     Spondylosis is often applied nonspecifically to any lesion of the spine of a degenerative nature.  STEDMAN'S at 1679.

4

August 19, 2004, indicated moderate to marked stenosis of the left C4-5, left C5-6, and left C6-7

neural foramina.[4]  (Tr. 284.)  The findings were consistent with diffuse, marked cervical

spondylosis.  There were also mild disc bulging and spurring, but no evidence of acute disc

herniation or significant central stenosis.  (Id.)  There was no significant change from a previous

study in April 2003.  (Id.)  An MRI of the lumbar spine performed on August 19, 2004, showed a

small to moderate sized disc herniation at L5-S1, small disc herniations at L4-5 and L1-2, and

disc bulging at multiple levels.  (Id.)

Plaintiff described his present symptoms to Dr. Thomas as burning pain and pressure in

his neck and left shoulder, and headaches.  (Tr. 282.)  His greatest pain was in the lower back,

radiating down the left leg with numbness.  (Id.)  He stated that his pain was aggravated by

riding in a car, prolonged walking, prolonged sitting, and overhead work.  (Id.)  He also said his

pain was alleviated by occasional use of Naproxen.  (Id.)

On physical examination, Dr. Thomas noted Plaintiff was moderately obese, and did not

exhibit pain behaviors, but he rose slowly from the chair and walked stiffly.  (Tr. 286.)  Plaintiff

reported tenderness throughout the cervical, thoracic and lumbar muscles, but there was no

palpable muscle spasm.  (Tr. 287.)  His cervical and lumber ranges of motion were normal.  (Id.)

Neurological examination was also normal.  (Id.)

Dr. Thomas noted that CT scans and MRI scans of Plaintiff's cervical and lumbar spine

indicated multi-level degenerative changes.  (Id.)  He opined that these changes reflected a long-

standing degenerative process.  (Id.)  Dr. Thomas stated, "[w]hat is remarkable is that [Plaintiff]

---

[4]      Foramina (plural for foramen) are apertures or perforations through a bone or a
membranous structure. STEDMAN'S at 698.

is claiming total disability where there really is nothing in the way of objective functional deficits . . ." (Tr. 288.)  Nevertheless, Dr. Thomas opined that Plaintiff's neck and back pain was caused by multi-level cervical and lumbar degenerative disc disease and spondylosis.  (Id.)  Dr. Thomas opined that Plaintiff was suited for medium duty work with lifting fifty pounds occasionally, twenty-five pounds more frequently, with no constant or repetitive overhead work, and no constant or repetitive bending, stooping, or twisting.  (Tr. 290.)

Plaintiff reported having severe neck, back and right knee pain when he saw Dr. Lewis on June 13, 2006.  (Tr. 258.)  On examination, Plaintiff had mild tenderness in the cervical and lumbar areas, and no acute swelling of the knee.  (Id.)

Plaintiff went to an emergency room on August 10, 2006, and complained of constant pain to his left shoulder, upper chest wall, and arm.  (Tr. 224.)   Echocardiography results were normal.  (Tr. 228.)  Dr. Jerrell Noller urged Plaintiff to see his primary physician for "what seems to be new muscular discomfort."  (Tr. 228-29.)

About a week later, Plaintiff went to an emergency room for treatment of abdominal pain, which had been increasing for five days.  (Tr. 241.)  Plaintiff was treated with morphine, and evaluated for diverticulitis.  (Tr. 243-44.)  A CT scan of his abdomen showed a fatty liver, a lesion of the left kidney, and diverticulosis.[5]  (Tr. 244.)  Plaintiff saw Dr. Lewis later that day, and was prescribed Vicodin for abdominal and low back pain.  (Tr. 256.)

Plaintiff saw Dr. Lewis again three days later, and reported that his abdominal pain had resolved, but he continued to have low back pain.  (Tr. 255).  Dr. Lewis gave Plaintiff a trial of

---

[5]     Diverticulosis is the presence of a number of diverticula (a pouch or sac opening from a tubular organ such as the gut or bladder) of the intestine, common in middle age. STEDMAN'S at 532.

Celebrex.  (Id.)

Plaintiff saw Dr. Vanda Niemi in follow-up at Noran Neurological Clinic on September

1, 2006.  (Tr. 319.)  Plaintiff had seen Dr. Niemi for neck, back and knee pain in 2004, and stated

that his neck and back were now worse.  (Id.)  On examination, Plaintiff had a somewhat

decreased range of motion at his neck and waist.  (Id.)  Reflexes, strength, and gait were normal.

(Tr. 319-20.)  Dr. Niemi recommended repeat MRIs and treatment with Robaxin.  (Tr. 320.)  The

MRIs were unchanged since previous examination on August 19, 2004.  (Tr. 315-18.)  After a

follow-up visit, Dr. Niemi opined:

> . . . [r]egarding the pain, numbness and tingling in his left arm and
> leg there certainly could be some contribution from the
> degenerative changes, particularly the three lumbar disc
> herniations seen on the MRIs.  Most specifically, there may be a
> left L4 radiculopathy . . .

(Tr. 313-14.)  Dr. Niemi recommended physical therapy.  (Tr. 313.)

On September 12, 2006, Dr. Lewis wrote a letter indicating that he had treated Plaintiff

for neck and back pain, and believed Plaintiff to have a total permanent partial disability of 20%

according to Minnesota statutes.  (Tr. 293.)  Dr. Lewis noted that an MRI of Plaintiff's cervical

spine showed marked multi-level degenerative disc disease and marked foramina narrowing at

C4-5, C5-6, and C6-7.  (Tr. 293-94.)  An MRI of Plaintiff's lumbar spine indicated L5-S1 disc

hernia, L4-5 disc hernia, L1-2 disc hernia, and marked multiple degenerative disc disease.  (Tr.

293, 295.)

Plaintiff was assessed for physical therapy on September 27, 2006.  (Tr. 298-99.)

Physical therapist Peter Lindquist noted Plaintiff to have neck and back pain, with mild loss of

cervical and trunk range of motion, and muscle tension in the upper and lower quarter muscles.

(Tr. 299.)  He recommended three to four weeks treatment with flexibility and strengthening exercises.  (Id.)  Mr. Lindquist discontinued physical therapy with Plaintiff on November 6, 2006, after eight sessions of therapy.  (Tr. 296.)  He reported that Plaintiff had not scheduled any further appointments or called back.  (Id.)  Mr. Lindquist noted that Plaintiff was tolerating exercises better, but there were not many changes overall.  (Id.)

On October 30, 2006, Plaintiff had an EMG study of the left arm and leg.  (Tr. 311.)  The study was normal.  (Id.)  On November 10, Plaintiff underwent an epidural steroid injection for his low back pain.  (Tr. 310.)

About a week after the injection in his back, Plaintiff complained to Dr. Lewis that treatment was not working and he continued to have severe neck and back pain.  (Tr. 292.)  On examination, Plaintiff was tender in the cervical and lumbar spine, with no spasm.  (Id.)  Dr. Lewis recommended that Plaintiff follow-up with neurology and continue taking Celebrex.  (Id.)  Plaintiff had an MRI of his lumbar spine on January 17, 2007.  (Tr. 308.)  There were no significant changes from the previous MRI on September 6, 2006.  (Id.)

Dr. Robert Wengler, an orthopedic surgeon, saw Plaintiff for an independent medical examination on February 1, 2007.  (Tr. 300.)  He noted that Plaintiff had documented stenoses at C5-6 and C6-7 in the cervical spine, and at L4-5, and L5-S1 in the lumbar spine.  (Id.)  He opined that Plaintiff was capable of employment with a twenty-five-pound lifting restriction, and that he should not be required to engage in repetitive bending, stooping, heavy pushing or pulling, or working in positions of prolonged postural stress.  (Id.)

In March 2007, Plaintiff saw Dr. Niemi in follow-up.  (Tr. 303.)  Plaintiff complained of a stiff neck, and pain in his lower back radiating to his left leg.  (Id.)  He said he was no longer

receiving physical therapy because he could not afford it, but he was doing two exercises at home.  (Id.)  Dr. Niemi noted there was no significant change in the findings of Plaintiff's MRIs of the lumbar spine performed in September 2006, and January 2007.  (Id.)  Dr. Niemi opined that there was "likely at least some contribution from the degenerative changes seen on the MRI of the cervical and lumbar spine" to explain Plaintiff's chronic neck and back pain with tingling and numbness in the left arm and leg.  (Id.)  She recommended treatment with home exercises and Nortriptyline.  (Tr. 304.)

Plaintiff underwent a functional capacity evaluation ("FCE") at Impact Physical Medicine & Aquatic Center on August 13, 2007.  (Tr. 326.)  Testing indicated less than full effort in hand grip strength.  (Tr. 336.)  Plaintiff was not asked to crouch, squat, kneel, or climb more than five or six stairs because he indicated he did not feel he could do so.  (Tr. 332.)  Cardiovascular testing was terminated due to Plaintiff's inability to maintain the required pace.  (Id.)  A lifting test was terminated due to Plaintiff's report of increasing back pain.  (Tr. 333.)  During the evaluation, Plaintiff's longest duration of sitting was thirty-eight minutes, standing was fourteen minutes, walking was thirteen minutes.  (Tr. 334.)

The summary of Plaintiff's physical efforts indicates that Plaintiff gave near full, but not entirely full, effort.  (Tr. 337.)  The evaluator explained that the sub-maximal effort, simply stated, was that Plaintiff "can do more physically at times than was demonstrated during this testing day."  (Id.)  Plaintiff also presented with five of seven anatomically unreasonable responses on the Waddell Inappropriate Symptoms Questionnaire.  (Tr. 338.)  The evaluator concluded:

> Overall test findings, in combination with clinical observations,
> suggest some minor inconsistency to the reliability/accuracy of

> [Plaintiff's] subjective reports of pain/limitations.  Overall
> inconsistencies were considered minor.

(Tr. 340.)

Dr. Fred Lewis completed a Physical Residual Functional Capacity Questionnaire on Plaintiff's behalf on September 11, 2007.  (Tr. 342-47.)  He diagnosed Plaintiff with herniated lumbar disc and spinal stenoses.  (Tr. 342.)  He indicated that Plaintiff was not a malingerer.  (Tr. 343.)  He also indicated that Plaintiff's experience of pain was frequently severe enough to interfere with attention or concentration.  (Id.)  Otherwise, he directed the reader to the functional capacity evaluation to find Plaintiff's functional restrictions.  (Tr. 343-44.)

**C.     Hearing Before the ALJ**

Plaintiff testified at the hearing before the ALJ on November 5, 2007.  (Tr. 7-20.) He testified that he lives with his wife, who is also on disability, although he did not remember the basis for her disability.  (Tr. 7.)  Plaintiff testified that driving a half hour or less caused him severe low back pain.  (Tr. 8.)  He testified that he cannot walk six blocks because his legs go numb after walking about two blocks.  (Tr. 9.)  Plaintiff also testified that his hands go numb at times, but he can relieve this by changing his hand position.  (Tr. 10-11.)

Plaintiff testified that he can do some housework on a good day, but he has to do it a certain way.  (Tr. 11.)  He takes pain medication during the day on some days, and almost every night so he can sleep.  (Tr. 12.)  Plaintiff testified that he feels the physical capacities evaluation he participated in was accurate in that he can lift eight pounds, sit for thirty-eight minutes, and stand for fourteen minutes.  (Id.)

Plaintiff testified that his neck hurts every day, and his low back hurts every morning and gets better during the day.  (Tr. 14-16.)  On a good day, he might do housework thirty to forty

minutes before he has to stop and rest for ten to fifteen minutes.  (Tr. 16-17.)  The majority of the day, he is laying on his back.  (Tr. 17.)  Plaintiff testified that the pain in his neck affects his ability to concentrate.  (Tr. 19-20.)

Dr. Jared Frazin testified as a medical expert ("ME") at the hearing.  (Tr. 22-25.)  He testified that Plaintiff had impairments of cervical spine and lumbar disease.  (Tr. 22-23.)  Dr. Frazin testified that based on Plaintiff's impairments, Plaintiff would be limited to sedentary work, with a sit/stand option, sitting between thirty and forty minutes at a time, standing fifteen to twenty minutes at a time, and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, but not climbing ropes, ladders or scaffolds, and only occasional manipulating overhead, and able to do simple grasping but not power grasping.  (Tr. 24-25.)  Dr. Frazin agreed that pain can be very subjective.  (Tr. 24-25.)

Steven Bosch then testified as a vocational expert. ("VE").  (Tr. 26.)  The ALJ posed several hypothetical questions to the VE about the types of employment certain hypothetical individuals could perform.  (Tr. 27-39.)  The first hypothetical question assumed the individual to be a forty-nine-year-old man with a ninth grade education, with the impairments and restrictions described in the ME's testimony.  (Tr. 27-28.)  The VE testified that such a person could not perform Plaintiff's past relevant work, which was performed at a medium exertional level.  (Tr. 28.)  However, he testified that there were unskilled jobs without high production goals that such a person could perform, such as a parking lot attendant who does not park cars, but takes money and gives change.  (Id.)  The VE testified that his opinion was based on his professional experience and personal observations, not the Dictionary of Occupational Titles ("DOT"), which listed parking attendant jobs as light exertional level.  (Tr. 28-29, 31.)  He

further testified that there were 1,000 such jobs in the state of Minnesota.  (Tr. 28.)

For a second hypothetical, the ALJ asked the VE to consider an individual with the restrictions contained in the functional capacities evaluation at Exhibit 16F.  (Tr. 29.)  The VE stated that his testimony would be unchanged.  (Tr. 30.)  For a third hypothetical question, the ALJ asked the VE to consider the restrictions proposed by Dr. Wengler at Exhibit 13F.  (Tr. 30-31.)  The VE testified that such a person could perform a wide variety of cashier jobs.  (Id.)  Plaintiff's counsel asked the VE whether tolerated absenteeism in employment is twice a month, and the VE agreed.  (Tr. 31.)  The VE agreed that a person absent from work in excess of that amount, or who needed more than two fifteen minute breaks with a half hour lunch, could not be competitively employed.  (Tr. 32.)  The VE also testified that a person who frequently experienced pain that interfered with attention and concentration could not perform the parking attendant job.  (Id.)

**D.** **The ALJ's Decision**

At the first step of the disability evaluation process, the ALJ found that the claimant has not engaged in substantial gainful activity since the alleged onset of disability date.  (Tr. 47.)  At the second step of the evaluation, the ALJ found that the claimant has severe impairments of cervical and lumbar disc disease.  (Id.)  The ALJ concluded that Plaintiff does not have a physical or mental impairment that meets or medically equals any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 48.)

At step four of the evaluation the ALJ found Plaintiff to have the residual functional capacity to lift ten pounds occasionally, five pounds frequently, sit for six hours of an eight-hour workday, be on his feet two hours of an eight-hour workday, with a sit/stand option, with the

ability to sit for thirty to forty minutes at one time, stand for fifteen to twenty minutes at one time, occasionally balance, stoop, kneel, crouch, crawl and climb stairs, but cannot climb ropes, scaffolds or ladders.  (Tr. 48.)  The ALJ concluded that the claimant could not perform his past relevant work.  (Tr. 51.)  However, the ALJ concluded that the claimant could perform other jobs that exist in significant numbers in the national economy.  (Tr. 52.)  Thus, the ALJ concluded that the claimant was not under a disability as defined in the Social Security Act.  (Tr. 53.)

## III.   STANDARD OF REVIEW

Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1994).  Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion.  Dixon v. Barnhart, 353 F.3d 602, 604 (8th Cir. 2003).  Where such evidence exists, a court is required to affirm defendant's factual findings.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision.  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary.  Id.

## IV.   DISCUSSION

Plaintiff alleges several errors in the ALJ's decision.  First, Plaintiff argues the ALJ's assessment of Plaintiff's residual functional capacity was incorrect based on the ALJ's failure to give proper weight to the treating physician's opinion, and failure to properly evaluate Plaintiff's subjective complaints.  Second, Plaintiff alleges the ALJ did not meet his burden to prove there

13

is other work which exists in significant numbers in the national or regional economy that Plaintiff could perform.

### A.       Residual Functional Capacity

"The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." Casey v. Astrue, 503 F.3d 687, 696-97 (8th Cir. 2007) (quoting Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004)) (additional citations omitted).  RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)).  In determining RFC, "the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." Id. at 738 (citing 20 C.F.R. § 404.1545(c); Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)). The ALJ must evaluate evidence in the record of the various physicians' opinions and the credibility of Plaintiff's subjective complaints.  See Id. (evaluating ALJ's RFC determination).

### 1.       Treating Physician's Opinion

Plaintiff contends the ALJ failed to perform the appropriate analysis of the physicians' opinions pursuant to 20 C.F.R. § 404.1527(d).  Plaintiff further contends the ALJ erred in granting more weight to the medical expert's opinion over the treating physician's opinion without explaining why the ME's opinion was better supported by the record.  Finally, Plaintiff contends the error was not harmless because, although the vocational expert testified that a person with the abilities described in the functional capacities evaluation could perform other work, the VE's testimony did not take into account Dr. Lewis' opinion that Plaintiff is not a malingerer, and Plaintiff's symptoms are severe enough to affect his concentration frequently.

14

Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527.
In according weight to medical opinions, the ALJ should consider the following factors:  (1) the
length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3)
the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the
record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. §
404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-
supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not
inconsistent with other substantial evidence" Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir.
2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  Even if a treating
physician's opinion is entitled to great weight, it does not obviate the court's need to evaluate the
record as a whole.  Leckenby, 487 F.3d at 632 (citations omitted).  An ALJ may discount a
treating physician's opinion "if other medical assessments are supported by superior medical
evidence, or if the treating physician has offered inconsistent opinions." Holmstrom v.
Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1012-13).

The ALJ noted that Plaintiff's treating physician, Dr. Fred Lewis, opined that Plaintiff
could not lift more than ten pounds or do any overhead lifting or bending, and that Plaintiff was
unable to perform any type of work.  (Tr. 50.)  The ALJ also noted that Dr. Lewis cited the FCE
report to describe Plaintiff's abilities.  (Id.)  The ALJ found Dr. Lewis' opinion unpersuasive for
several reasons.  First, Dr. Lewis did not cite any clinical signs or work-related limitations on the
Minnesota Department of Employment and Economic Development Medical Statement form
(Exhibit 2F) to support his opinion of total disability.  (Id.)  Second, Dr. Lewis' treatment notes

overall do not support the conclusion that Plaintiff was totally disabled because Plaintiff's neck and back tenderness and decreased range of motion were generally mild, with no muscle spasm, and no neurological findings.  (Id.)

This analysis by the ALJ is supported by the record.  Over the course of fourteen months, the record indicates two office visits with Dr. Lewis where claimant exhibited moderate tenderness and mild spasm, and two visits with marked lumbar tenderness.  (Tr. 256, 262, 267-68.)  Otherwise, Plaintiff's only clinical findings in his visits with Dr. Lewis were mild tenderness in the neck and lower back.  (Tr. 255, 258-61, 263-266, 342.)  An office visit on September 23, 2005, is particularly significant.  (Tr. 264.)  Dr. Lewis' notes indicate Plaintiff was seeking work restrictions, but on physical examination Plaintiff exhibited only mild cervical and lumbar tenderness with good range of motion, and no spasms.  (Id.)  Nevertheless, Dr. Lewis wrote work restrictions for no lifting more than ten pounds, no lifting above the head and no bending.  (Id.)  It is hard to imagine how these work restrictions are supported by only mild tenderness on clinical examination.

The ALJ also discounted Dr. Lewis' opinion because Dr. Lewis relied on a physical functional capacity evaluation that was of questionable validity.  (Tr. 50-51.)  The ALJ noted that Plaintiff did not give full effort during the evaluation, and presented with five of seven inappropriate responses on a test suggestive of "inappropriate illness behavior."  See Reinertson v. Barnhart, 127 Fed. Appx. 285, 289 (9th Cir. 2005) (Waddell signs are used to detect nonorganic sources, such as psychological or malingering, for low back pain.  Three of five Waddell signs are considered clinically significant.)  Plaintiff's submaximal effort and presentation of inappropriate illness behavior are valid reasons for the ALJ to discount Dr.

Lewis' opinion that the evaluation accurately reflects Plaintiff's functional abilities.

Dr. Frazin proposed, and the ALJ adopted, an RFC that contains greater functional restrictions than proposed by Dr. Thomas or Dr. Wengler, both of whom are orthopedic surgeons who examined Plaintiff for independent medical exams. Dr. Frazin's opinion is consistent with the ability to perform work activities at a similar, but slightly greater sedentary exertional level than indicated in Plaintiff's FCE report. Dr. Frazin's opinion is more consistent with the record as a whole than Dr. Lewis' opinion, as is further discussed below. The ALJ did not err in granting greater weight to Dr. Frazin's opinion than to Dr. Lewis' opinion.

**2.      Credibility Analysis**

Plaintiff contends the ALJ erred by failing to analyze Plaintiff's daily activities, use of medication, and other <u>Polaski</u> factors such as work history in finding Plaintiff not fully credible. Plaintiff also argues the ALJ erred in his analysis of Plaintiff's functional capacity evaluation report.

The ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. <u>Casey</u>, 503 F.3d at 695 (8th Cir. 2007) (citing <u>Polaski v. Heckler</u>, 729 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must take into account, but does not need to discuss how each factor relates to plaintiff's credibility. <u>Id.</u> (citing <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004). The ALJ may discount subjective complaints when they are inconsistent with the evidence as a whole. <u>Id.</u>

(citing Polaski, 739 F.2d at 1322).

"The ALJ is not required to discuss each Polaski factor as long as the analytical

framework is recognized and considered."  Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir.

2004).  The ALJ fulfilled this requirement.  He explicitly recognized his duty to consider the

Polaski factors in determining Plaintiff's credibility.  (Tr. 48-49.)  He thoroughly reviewed

Plaintiff's hearing testimony, the various physicians' opinions, and the medical evidence in the

record, but concluded that the severity of Plaintiff's subjective complaints was not supported by

the medical evidence or the record as a whole.  (Tr. 49-51.)

The ALJ considered the MRI findings of Plaintiff's cervical spine, but noted there was no

evidence of acute disc herniation or central stenosis.  (Tr. 49.)  He also noted that the MRI

findings of Plaintiff's lumbar spine revealed disc herniations that were small to moderate in size,

with no evidence of nerve root impingement, and the record contained no test results that would

establish the presence of radiculopathy or neuropathy.  (Tr. 50.)  The ALJ reviewed the clinical

findings, which were largely negative.  (Id.)  The medical record supports the ALJ's conclusion

that Plaintiff's symptoms were not as severe as alleged.  (Tr. 203-20, 241-54, 255-68, 271-91,

292-95, 306-22.)  However, the ALJ cannot discount Plaintiff's subjective complaints solely

based on the lack of objective findings.  Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).

As discussed above, the ALJ discounted Dr. Lewis' opinion in part because Plaintiff did

not put forth full effort during the functional capacity evaluation, and he exhibited five out of

seven Waddell signs.  (Tr. 50.)  The ALJ also found Plaintiff's subjective complaints not fully

credible on this basis.  Plaintiff argues the functional capacity evaluator found the

inconsistencies in the evaluation to be only minor, and not indicative of malingering.  The FCE

report also states "[Plaintiff] can do more at times than he currently states or perceives."  RFC is

the most a claimant can still do in spite of his impairments.  20 C.F.R. § 404.1545(a).  The ALJ's

RFC determination was consistent with the FCE  because the ALJ found Plaintiff to have a

residual functional capacity only slightly greater than was indicated in the FCE.  For example,

the FCE report indicated Plaintiff could sit for thirty-eight minutes.  The ALJ found that Plaintiff

required a sit/stand option allowing him to change position every thirty to forty minutes.  The

FCE report indicated that Plaintiff could stand for fourteen minutes before needing to change

position.  The ALJ found that Plaintiff could stand for fifteen to twenty minutes.  This slight

difference is consistent with the fact that Plaintiff could do more than he stated or perceived.

Substantial evidence supports the ALJ's RFC finding.

Plaintiff also contends the ALJ erred by failing to consider his consistent work history as

a favorable credibility factor.  However, there is also evidence regarding Plaintiff's work history

that detracts from Plaintiff's credibility.  Plaintiff indicated in a Disability Report that he stopped

working on October 13, 2005 because "I was fired for not responding to an on call duty request.

I feel they wanted to let me go since new management came in."  (Tr. 161.)  It is relevant to

credibility when a claimant leaves work for a reason other than disability.  Goff v. Barnhart, 421

F.3d 785, 792-93 (8th Cir. 2005).  Although Plaintiff was seeking treatment for neck and back

pain prior to losing his job, the record indicates that he worked many years with back pain, and

several years with neck pain.  (Tr. 281, 283-84.)  Furthermore, his neck and back condition,

according to MRIs taken from 2003-2007, never significantly changed from when he was

working until several years after he stopped working.  (Tr. 284, 303, 315-18.)  Where substantial

evidence supports the ALJ's determination, the court must affirm, even if the evidence might support a different conclusion.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).

**B.     Other Work Which Exists in Significant Numbers in the Economy**

Plaintiff alleges the ALJ misstated the VE's testimony, which he alleges is significant because the ALJ never analyzed whether one job category with 1,000 positions in the economy is evidence that there a significant number of jobs Plaintiff could perform.  Plaintiff focuses on the ALJ's statement that, "[t]he vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as parking lot attendant (915.473-010), of which there are 1,000 such jobs in the Minnesota economy."  Plaintiff appears to be concerned that the ALJ believed there was more than one job category that fit Plaintiff's RFC because the ALJ referred to representative "occupations" in the plural.  Plaintiff also contends the ALJ failed to consider the factors described in Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) to determine whether a significant number of other jobs exist.

There is nothing in the record to suggest that the ALJ believed there to be more than 1,000 jobs in the state of Minnesota which Plaintiff could perform.  (Tr. 53.)  In response to the ALJ's first hypothetical question, the VE only testified to one type of job and one DOT Code that fit the hypothetical, parking attendant.  (Tr. 28.)  He very clearly testified that there were 1,000 such jobs in the state of Minnesota, which were limited to a cashier who takes money and gives change.  (Tr. 28-29.)  In response to the ALJ's question, "any other examples?" the ALJ said there were two other sedentary jobs, but they would not allow for the sit/stand option in the hypothetical, thus, there were no other jobs.  (Tr. 29.)  In the hearing decision, the ALJ

recognized the VE testified to the existence of a reduced number of parking attendant jobs, not

based on the Dictionary of Occupational Titles, but on the VE's own knowledge of parking

attendant jobs that were basically cashier positions.  (Tr. 28-29, 53.)

This Court can find no precedent which requires the ALJ to discuss, in his written

decision, the factors described in <u>Jenkins v. Bowen</u>, 861 F.2d 1083, 1087 (8th Cir. 1988) for

determining whether there are a significant number of jobs in the economy which the claimant

could perform.  Although discussion of these factors, especially in a close case, is helpful for a

court's review, courts have affirmed ALJ determinations that 1,000 or even fewer jobs in the

state which a claimant could perform satisfy the "significant number" requirement.  <u>Hall v.

Chater</u>, 109 F.3d 1255, 1259-60 (8th Cir. 1997); <u>Long v. Chater</u>, 108 F.3d 185, 188-89 (8th Cir.

1997).  Therefore, the Commissioner's decision should be affirmed.

## V.   RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1.  Plaintiff's Motion for Summary Judgment be denied [Docket No. 17];

2.  Defendant's Motion for Summary Judgment be granted [Docket No. 22].

DATED: December 17, 2008

<i>s/ Franklin L. Noel</i>    <br>
FRANKLIN L. NOEL<br>
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by
filing with the Clerk of Court and serving on all parties, on or before **January 7, 2009,** written
objections which specifically identify the portions of the proposed findings or recommendations
to which objection is being made, and a brief in support thereof.  A party may respond to the
objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall
be limited to 3500 words.  A judge shall made a de novo determination of those portions to

which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.